**FILED**

JAMES J. WALDRON, CLERK

February 27, 2012
U.S. BANKRUPTCY COURT
NEWARK, N.J.
By:    /s/Margaret Cohen
Deputy

**FOR PUBLICATION**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re | Chapter 7 |
| JONG HEE KANG, | Case No.   11-43988 (MS) |
| Debtor. | Judge Morris Stern |

## <u>OPINION</u>

<u>**APPEARANCES**</u>

Kim, Cho & Lim, LLC
Hyung Seok Kim, Esq.
Seoung (Joshua) Lim, Esq.
460 Bergen Boulevard, Ste. 201
Palisades Park, NJ  07650
Attorneys for Debtor

Hellring, Lindeman, Goldstein & Siegal, LLP
John A. Adler, Esq.
Patricia A. Staiano, Esq.
One Gateway Center
Newark, NJ  07102
Attorneys for Chapter 7 Trustee

Joseph M. Feeney, Esq.
BNB Bank, N.A.
250 Fifth Avenue
New York, NY   10001
Attorney for BNB Bank, N.A.

Sangwon D. Sohn, Esq.
2033 Lemoine Avenue, Ste. 205
Fort Lee, NJ  07024
Former Attorney for Debtor

Fran B. Steele, Esq.
Office of the U.S. Trustee
District of New Jersey
One Newark Center, Ste. 2100
Newark, NJ  07102


**HONORABLE MORRIS STERN, Bankruptcy Judge**

Debtor moves to dismiss her Chapter 7 bankruptcy case, arguing the mechanics of the

filing process were flawed in that she assumes she did not comply with § 109(h) and § 521 of the

Bankruptcy Code; that is, Ms. Kang claims to have never received *that* credit counseling which

is reflected in a November 28, 2011 credit counseling certificate.[1]  In a long, very articulate

certification ("Kang Cert.") (docket entry 36) Ms. Kang, who states that she cannot read or write

English (Kang Cert. ¶ 34), laid much of her current dilemma at the feet of her prior attorney

(Sangwon D. Sohn, Esq., "Sohn").

However, Ms. Kang's petition as amended and her detailed portrayal of events dating

back to at least September 2009 belie her position as to a current right to a voluntary dismissal of

her case.  In particular, Ms. Kang describes the following:  (i) her extended contemplation of

bankruptcy (culminating in her November 28, 2011 filing); (ii) her relatively extraordinary

---

[1] Ms. Kang's "bare bones" Chapter 7 bankruptcy petition was filed electronically on that date by her prior attorney; she recalls what she says was a December 8, 2011 session with her attorney which might well have been the internet-based counseling.  In fact, the debtor's former counsel appeared at oral argument and said he had facilitated computer-based credit counseling for Ms. Kang *three times,* including an early session in February 2010, then on an emergent basis on November 28, 2011 via telephone with her (and using some of her 2010 responses), and yet again on December 8, 2011.  Debtor's current counsel endeavored to put at issue these representations of prior counsel, but not as a function of any certified statement of Ms. Kang.  As will be seen hereinafter, potential matters of credibility of Ms. Kang and her former lawyer need not be resolved.

secured, would-be secured, and general unsecured debt (now scheduled at over $2 million

notwithstanding a history of only modest income, i.e., approximately $36,000 annually including

more than half from her spouse); (iii) the debtor's obvious but failed effort to prefer her sister as

a creditor by wiping out (with a $400,000 mortgage) the equity in what is essentially the estate's

sole asset – Westfield real estate[2]; and (iv) her early signed certification to the accuracy of her

petition (including reference to credit counseling at Exhibit D), now followed by the debtor's

ambiguous and vague description of what could well have been an internet credit counseling

interview through her attorney ("Sohn asked me a series of questions while looking at his

computer monitor . . . he stated . . . I should try to be frugal in my spending . . . [h]e asked me

more questions, but I cannot recall exactly what the questions were . . . at the end Mr. Sohn

asked me if I understand all the questions he asked . . . I stated 'yes' . . . ." (Kang Cert. ¶ 8)).

## CHRONOLOGY

| | |
|---|---|
| September 2009 | Debtor consulted with and retained Sohn following formal creditor collection efforts; discussed Chapter 13. (Kang Cert. ¶¶ 3 and 8). |
| January 2010 | Sister ("Jongim") "requested" a mortgage to secure a loan (which Jongim is said to have made to the debtor so the debtor, in turn, could repay lender-friends who had advanced money over fifteen years through Kang to her friend "Joo"). (Kang Cert. ¶ 19, as to "request," and ¶¶ 10-12 as to Joo pass-through loans.)   No |

---

[2]It is emphasized that the debtor's pre-petition *perception* (and that of her attorney) as to the effect such a mortgage would have was not necessarily accurate; apparently liens including judgment liens seem to have interdicted the would-be mortgage lien and would have "trumped" the sister's mortgage. However, the amount of those liens does not seem to absorb all of the substantial equity in the property behind the first mortgage held by BNB Bank.  Moreover, and again seemingly unperceived early on, the trustee's arsenal in bankruptcy would eventually become powerful in avoiding both judgment liens where there had been no execution (11 U.S.C. § 544(a)) and a mortgage securing an antecedent debt to an insider such as the debtor's sister (11 U.S.C. § 547 and N.J.S.A. 25:2-27(b) via 11 U.S.C. § 544(b)).

|  | mortgage appears to have been prepared at this time.  The Jongim loan is said to date back to some time in 2007. |
|---|---|
| May 2011 | BNB Bank serves debtor with a Notice of Intention to foreclose (Kang Cert. ¶ 22.) |
| July 2011 | Sohn prepares a mortgage (dated July 13, 2011), naming sister Jongim as the secured party; the mortgage is never recorded, though Kang thought it was to be recorded.  (Kang Cert. ¶¶ 23 and 24.) |
| Fall 2011 | Sheriff appears at Kang's business to execute based upon default judgments.  (Kang Cert. ¶ 3.)  The trustee has been advised that one creditor, through execution, had a sheriff's sale of personalty scheduled for November 29, 2011. |
| November 28, 2011 | The first six pages of the Chapter 7 petition (including the Exhibit D representation of credit counseling) are electronically filed by Sohn; a matrix naming only seven creditors was included, but there were no schedules; also filed on that date was a credit counseling certificate of that date.   The filing was seemingly done in haste to stop a sheriff's sale of personalty the next day. |
| December 8, 2011 | Debtor says she appeared at Sohn's office and signed documents (*see* Ex. A to Kang Cert., three signature pages dated December 8, 2011); she claims to have been unaware of the earlier filing. (Kang Cert. ¶¶ 7-9 and 29.) |
| December 13, 2011 | Sohn files missing schedules electronically; filed are Schedule D (secured claims) at $610,000 (including *only* the sister's $400,000 mortgage and the first mortgage of BNB Bank of $210,000), and Schedule F (unsecured nonpriority claims) at $93,000 (five creditors). |
| January 5, 2012 | Sohn, without the debtor, appears at the scheduled § 341(a) meeting; the debtor claims to have been unaware of the meeting (Kang |

|  | Cert. at ¶¶ 32-35); Sohn seems to have been advised of the trustee's conclusion that the Westfield real estate had equity and would be marketed by the trustee (*see* docket entry 28 at ¶ 5(b)). |
|---|---|
| January 19, 2012 | Trustee applies to retain an auctioneer to sell the real estate (granted). |
| January 20, 2012 | Trustee files a Notice of Information of Public Auction (to take place February 23, 2012) and files a motion in support of the sale. |
| January 26, 2012 | Trustee files a Notice of Assets. |
| January 30, 2012 | On or about this date Sohn is said to have advised Kang of the question of the "validity" of Jongim's mortgage. (Kang Cert. ¶ 26.) |
| February 2, 2012 | Sohn files a cryptic motion to convert the case to Chapter 11. |
| February 3, 2012 (2 a.m.) | Sohn files revised Schedules D and F, indicating only a single secured creditor (BNB Bank with a $210,000 claim),[3] and unsecured nonpriority claims of $1,865,740 (including $400,000 due sister Jongim) and listing twenty-seven[4] unsecured creditors and twenty-eight creditors *in toto*. |
| February 3, 2012 | Debtor attends § 341(a) meeting; issue of credit counseling is not raised by the debtor, who responds affirmatively to the trustee's questions about execution of documents (but |

---

[3] Again, it is emphasized that the *perception* in the debtor's camp was *first* that the $400,000 mortgage would have been the only lien on the Westfield property other than BNB Bank's $210,000 first mortgage, and *then* (by amendment) the perception was as reflected in Schedule D that BNB Bank stood *alone* as a lienor.

[4] The amended Schedule F is nothing short of startling: *fifteen* (15) listed creditors, many with only a single name (apparently a first name), including "Jessica's Mother" for $10,000, are stated as having the same mailing address ("c/o YS Yi, 124 Braine Avenue, Seaside Heights, NJ 08751"). The trustee speculates that these listed creditors, and perhaps others, are part of a mutual lending society. Ms. Kang does not list in her schedules *as an asset* any debit account in any such society. Yet she apparently has borrowed seven-figure amounts from these creditors and has borrowed $400,000 on behalf of her friend (whether from this group or other friends) based upon Ms. Kang's creditworthiness among her friends. *See* Kang Cert. at ¶ 11.

|                    |                                                                                                                                                                                                                                                                      |
|--------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                    | now claims to have been unaware of the range of documents being referred to, asserting "I answered yes because I believed that I reviewed all of the documents with Mr. Sohn on December 8, 2011 . . . I do not know what other documents Mr. Sohn submitted. . . ."). (Kang Cert. ¶ 36.) |
| February 8, 2012   | Kim, Cho and Lim, LLC substituted as counsel to the debtor, replacing Sohn.                                                                                                                                                                                            |
| February 9, 2012   | Trustee files a motion for possession and application to shorten time for hearing, as a precaution against the debtor's refusal to vacate the Westfield premises following the proposed sale (the auction intended to be held on February 23, 2012). |
| February 13, 2012  | Trustee files an application to retain an appraiser (granted).                                                                                                                                                                                                         |
| February 15, 2012  | Court *sua sponte* schedules and holds a telephonic conference on the record to determine the status of pending matters; adjourns the sale without date and the sale motion, motion for possession and motion to convert (said to be subject to withdrawal) to February 27, 2012; it is anticipated that the immediate motion to dismiss the case will be filed, to be heard on shortened notice on the same date. |
| February 20, 2012  | Debtor through Mr. Kim files the instant motion to dismiss.                                                                                                                                                                                                            |

## DISCUSSION.[5]

The *debtor's* right to rely on missing or flawed credit counseling as a basis for dismissal

is, at best, overstated by the movant.  Conceptually, the credit counseling *eligibility* requirements

---

[5] This court has subject matter jurisdiction and authority to hear and determine this motion, which is "core," all as a function of 28 U.S.C. §§ 1334(a) and (b), 157(a) (and this district's 1984 Order of Reference), §§ 157(b)(1), and 157(b)(2)(A) and (O).

of 11 U.S.C. § 109(h) are neither jurisdictional nor nonwaivable. *See In re Fiorillo,* 455 B.R. 297, 305 (D. Mass. 2011), and cases cited therein. Similarly, noncompliance with § 109(h) neither serves as an absolute mandate for case dismissal nor a bar to court inquiry into (i) the debtor's motive for seeking dismissal**,** (ii) impact upon the creditors, and (iii) estoppel issues based upon the debtor's conduct and previous representations on the record. *Id.* at 304 and 307. And, most particularly in this case, the debtor's own statements about a certain computer-centered question-and-answer session with her attorney give cause to believe that there was actual online credit counseling.[6]

    A.    <u>Debtor's Motivation for Seeking Dismissal</u>.

Courts do not necessarily agree that dismissal is a remedy even where a *trustee* or *creditor* seeks dismissal for a credit counseling infraction. However, "there is relative consensus among the few courts that have addressed debtors' motions, *especially when the debtor's motive for seeking dismissal is other than pure.*" *Id.* at 304 (emphasis added). That consensus disfavors Ms. Kang *sub judice*.

Debtor, having flirted with bankruptcy for years, was being hounded by bank-creditors (including a foreclosing secured creditor and an executing judgment creditor). It was only *after* she had signed a $400,000 mortgage for the benefit of her sister that she authorized the bankruptcy filing. She readily admits that she believed that that July 13, 2011 mortgage had been recorded. The story Ms. Kang tells (without a single document backing it up) is that her sister, in the past and apparently said to date back to 2007, had made a loan to her of $400,000.

---

[6] Debtor's only clearly stated dispute about credit counseling is that she was not counseled on November 28, 2011, the date on the filed certificate of credit counseling; a computer oriented question-and-answer session was said by Ms. Kang to have been held December 8, 2011. Though not necessary to a determination *sub judice,* Mr. Sohn represented most directly and in open court at oral argument on the motion *that the debtor had had credit counseling three times,* once in February 2010, once on November 28, 2011(via telephone and with Mr. Sohn's connection to the internet), and yet again on December 8, 2011.

Ms. Kang then "exhausted most of the $400,000 in repaying the Lenders."  Kang Cert. at ¶ 12.

"The Lenders" were "mutual friends" of Ms. Kang and her friend Joo, and the loans were made

to Joo over a fifteen-year-period through Kang ("I had much better credit amongst our friends").

Kang Cert. ¶ 10.

The fifteen years of loans and their repayment are likewise not documented by anything

placed in this case's record to date.  Nevertheless, assuming that the loans (Lenders to Kang to

Joo, and Utah-based sister Jongim to Kang to Lenders) were not fictional, at best Ms. Kang was

attempting to promote (and thought she had succeeded in promoting) a preference to her sister.

She also thought the sister-mortgage "would prevent BNB Bank's foreclosure action" (Kang

Cert. at ¶ 23).  These are perhaps rough and tumble tactics (and seemingly quite divorced from

(i) the actual status of title of the Westfield property, and (ii) an understanding of the trustee's

arsenal in bankruptcy).  Yet in the ordinary course they are not sanctionable *assuming that they

are footed in real debt.*  Transfer avoidance is the usual remedy.  *See* 11 U.S.C. §§ 544(a) and (b)

and 547; N.J.S.A. 25:2-27(b).  However, in the context of this case, Ms. Kang's asset-diversion

tactics are relevant to her effort to exit bankruptcy.

As it turned out, Ms. Kang's tactics (whether or not devised with advice of counsel and

whether or not based on faulty assumptions) failed.  The mortgage of July 13, 2011 went

unrecorded.  Sister Jongim is not protected with the equity (after the first mortgage of BNB

Bank) in the Westfield property.  What to do now, post-petition?  The debtor's response through

counsel was first to increase the creditor body almost twentyfold with what seems to be affiliated

unsecured creditors; then to replace that counsel; and then, through replacement counsel, to find

a loophole in the filing.  Thus, the apparent motivation for seeking dismissal is to rework a

strategy which would be more successful in Ms. Kang's effort to secure her sister or otherwise

dispose of any equity in the Westfield property and resist paying strangers.[7]  As such, "the

debtor's motive for seeking dismissal is other than pure."  *In re Fiorello*, 455 B.R. at 304.

B.    Debtor's Use of the Bankruptcy Processes.

Meanwhile, the debtor took advantage of the automatic stay, stopped execution and

foreclosure, and implicated the trustee's administration of the case (including two § 341(a)

appearances, the "teeing-up" of a sale with notices to the public and advertising, the retention of

professionals, and what is now substantial motion practice).  Once a debtor so engages the

bankruptcy process, she forfeits her right to cancel what she set in motion without establishing

appropriate cause.  *Sub judice* the *perhaps* purported absence of credit counseling (or, in the

alternative, the filing of a certificate not consistent in terms of timing of what appears to have

been an internet interview) is not such "cause."   The clear motivation for seeking this dismissal

is Ms. Kang's realization of the failure of her asset-diversion tactic.[8]

C.    Overarching Case Characteristics.

The aforestated family-preference tactics and the setting in motion of case administration

are weighty factors to consider in deciding whether to dismiss this case, *assuming* that the court

concludes there was no credit counseling or that Ms. Kang is not estopped from denying what

she had certified at the outset of the case.  As weighty as these factors are, there is yet another

which is overarching**.**  The debtor's petition which is now before the court – as supplemented by

her own certification – presents a preposterous picture.  That picture, once exposed, cannot be

---

[7] The fact that the bankruptcy process would impact on judgment creditors' claims as real estate lienors, and that outside of bankruptcy those lienors might disadvantage to some uncertain extent Ms. Kang's tactics, may have been lost on Ms. Kang up to this point.  Or, in the alternative, she may still believe that she can direct *some* residual real estate equity to her sister, ahead of certain of the stranger-creditors.  Moreover, while Ms. Kang might appear to the outside observer to be best situated in bankruptcy, she may not see it that way.

[8] Whether Ms. Kang is now discomforted by the documentation requirements of bankruptcy, including financial records, income verification and tax returns, is only a matter of speculation at this time.

re-closeted while a new avoidance scheme is hatched. Ms. Kang would have the court, the

trustee, her creditor body and the public believe that she ran up $2 million of debt while earning

$1,500 a month as a manicurist (as supplemented by her husband's $1,700 per month). Her

Schedules I and J reflect a grand total of $70 a month in "net" income after living expenses. Yet

she owes $2 million. One would be blind to any sense of proportion not to question the income

(Ms. Kang *owns* a nail salon in an upscale suburb) or what is stated as the creditor body, or both.

So too, reason would have a fiduciary question the Lenders-Kang-Joo/sister-Kang-Lenders daisy

chain of *purported* loans totaling $400,000. Thus, the *bona fides* of the loan backing the would-

be mortgage is subject to scrutiny. Hence, this case has begun to develop attributes of an

*involuntary* action as the debtor attempts to exit. And, of course, credit counseling is not

required (nor could it be) in involuntary cases. *See In re Allen,* 378 B.R. 151 (Bankr. N.D. Tex.

2007). In any event, there is a clear *public purpose* to be served in investigating Ms. Kang's

finances in this forum.

      D.    <u>Analysis of "Cause" for Dismissal Per 11 U.S.C. § 707(a)</u>.

Indeed, if the red-herring issue of credit counseling is removed from this case, dismissal

at the behest of the debtor is best analyzed under § 707(a) precedent centering on debtor-asserted

"cause" for dismissal. Most glaringly absent from Ms. Kang's effort to remove herself from the

bankruptcy process that she voluntarily initiated is any protestation that she would – outside of

bankruptcy – meet her financial obligations. Nor is there any reason to believe that she would

not follow through with the insider preference (or, if not truly in payment of an antecedent debt,

fraudulent transfer) favoring her sister. *Compare and contrast In re Jabarin,* 395 B.R. 330

(Bankr. E.D. Pa. 2008).

Case 11-43988-MS   Doc 49   Filed 02/27/12   Entered 02/27/12 16:32:11   Desc Main
Document    Page 11 of 15

11 U.S.C. § 707(a) allows *the court* to dismiss a Chapter 7 case "only after a notice and hearing and only for cause." The section provides a non-exclusive list of elements constituting cause. The Code does not expressly state that § 707(a) applies to a debtor seeking voluntary dismissal, but "'courts have found that chapter 7 debtors may move for dismissal under this section.'" *In re Jabarin*, 395 B.R. at 337 (internal citations omitted).

> [C]ourts frequently observe that while a chapter 7 debtor may choose to place himself or herself in bankruptcy voluntarily, the debtor does not enjoy the same freedom to withdraw the bankruptcy case as of right once it has been commenced.

*Id.* The debtor has the burden of establishing "cause," and a finding of cause "is committed to the sound discretion of the bankruptcy court." *See id.* at 337-38 as to court-established standards for determining cause for debtor's voluntary dismissal; *see also In re Turpen*, 244 B.R. 431, 433-34 (B.A.P. 8th Cir. 2000); *compare and contrast In re Lopez*, 2010 WL 5055826 (D.N.J. Dec. 2, 2010).[9]

In most basic terms *Jabarin* views the analysis "as a factually intensive assessment of the debtor's reasons for requesting dismissal and of the impact dismissal can be expected to have on the creditors. Such an approach is susceptible to being labeled a balancing test . . . [which] affords bankruptcy courts the flexibility needed to make the equitable determination whether there is 'cause' for a voluntary dismissal under § 707(a)." 395 B.R. at 339.

---

[9] *In re Lopez* (at *6) relied in part on *In re Aupperle*, 352 B.R. 43 (Bankr. D.N.J. 2005), as well as *Turpen* and *Jabarin*, to assemble a list of factors generally considered by courts in evaluating a debtor's motion to dismiss. Ms. Kang's motion is largely discredited by these non-exclusive factors: creditors do not appear to consent to the dismissal (*see* BNB Bank's vociferous objection at docket entry 42), serious questions persist as to Ms. Kang's good faith, dismissal would delay payment to creditors, priorities would seem to be reordered by the dismissal (through "loss" of the trustee's avoidance powers and the potential that Ms. Kang would perfect her sister's purported loan-based lien), no comprehensive claim payment proceeding would replace bankruptcy, and the case is otherwise rife with issues implicating trustee avoidance powers, claims allowance and disallowance, marshaling of assets and even potential discharge questions.

11

Thus, the two recurring factors in the court's analysis can be summarized as: (i) good faith of the debtor; and (ii) prejudice to the creditors. *Id.* at 340. Good faith in the context of debtor's application for § 707(a) dismissal includes sensitivity to indicia that the debtor is attempting to manipulate the process or is requesting termination of the process after having reaped its rewards. *Id.* Prejudice in this context includes the impact of the stay on other proceedings and the effect of the loss of a "motivated fiduciary" (the trustee) on the creditors. *Id.* at 340-41. In *In re Jabarin,* although the court found that the debtor acted in good faith (even though he tried to shield assets from creditors for the benefit of family), the analysis tipped in favor of the creditors who would suffer prejudice if the case were dismissed. *Id.* at 342. *In re Jabarin* concurred with the general principle that "'[t]he discovery of assets is not cause to dismiss' a bankruptcy case, but rather, '[i]f anything, . . . is grounds for retaining jurisdiction, i.e., that creditors who perhaps expected to recover nothing on their claims may be assured of an equitable and full distribution of the debtor's newly discovered assets.'" 395 B.R. at 342-43, *quoting In re Baumgarten*, 154 B.R. 66, 69 (Bankr. S.D. Ohio 1993), *citing In re Williams*, 15 B.R. 655 (E.D. Mo. 1981), *aff'd,* 696 F.2d 999 (8th Cir. 1982) (Table) and *In re Blackmon*, 3 B.R. 167 (Bankr. S.D. Ohio 1980).

Under the balancing test of § 707(a) precedent, Ms. Kang's good faith remains suspect, while prejudice to non-insider creditors via dismissal is palpable. Ms. Kang has thus not established "cause" for dismissal.

E.    Judicial Estoppel.[10]

Ms. Kang, through counsel (Sohn), came before this court with a bankruptcy petition. She sought to use the process for her benefit, for the benefit of her family and seemingly for her

---

[10] All of points A through D, *supra,* are incorporated here by reference.

friends.  As the owner of a business and a valuable piece of mixed use (residential and commercial) real estate, Ms. Kang pleads that she be viewed as an "innocent victim" (as characterized by her replacement counsel).  This court sees neither the innocence nor victimization of the debtor,[11] given the following:

(i)      Ms. Kang does not deny intending to file for bankruptcy (rather, she was on and off with it for over two years);

(ii)     Ms. Kang had retained bankruptcy counsel as early as 2009;

(iii)    Ms. Kang provides a hard copy of the petition signature page declaring "under penalty of perjury that the information provided in this petition is true and correct," dated December 8, 2011 (later than the actual electronic filing of November 28, 2011);

(iv)    Ms. Kang claims not to read or write English (thus presumably requiring an oral description of what she signs and, again presumably, reliance in this case on her retained counsel);

(v)     Ms. Kang acknowledges that on December 8, 2011 there was a computer-centered question-and-answer session with her attorney looking at the monitor and asking her about her expenses and other matters which she now cannot recall;

(vi)    Ms. Kang does not deny authorizing the filing on her behalf of a bankruptcy petition (but claims that she did not know it had been filed as early as November 28, 2011, the day before a scheduled sheriff's execution sale);

---

[11] BNB Bank (by certification of its officer, docket entry 42) opposes dismissal and asserts that the debtor has not acted in good faith.  Ms. Kang is said to have not paid real estate taxes since 2010, stopped making payments on the bank's mortgage as of September 1, 2010, and has not availed herself of the bank's willingness to reduce monthly payments (for a one-year period) from $1,995.87 to $1,000. Serious questions are raised about use of rental proceeds from the Westfield property.  Besides the fact that Ms. Kang pays no rent for her nail salon's occupancy at the Westfield property and for her residency there, *the trustee has discovered that recently all rents from unaffiliated tenants have been diverted to the debtor's husband in California.*

(vii)    Ms. Kang readily admits trying to encumber her real property with a $400,000 mortgage favoring her sister in Utah, Jongim; and

(viii)    Ms. Kang readily admits that she believed the Jongim mortgage had been recorded in July 2011, thus (as she perceived it) encumbering her property to the full extent of her equity, months in advance of her bankruptcy filing.

Under all of the circumstances of this case, Ms. Kang's argument that a predated credit counseling certificate provides her with an "out" from a bankruptcy which she *authorized* and in which she *participated* should be denied based upon concepts of estoppel.  Judicial estoppel precedent supports such a denial.  Ms. Kang entered bankruptcy through her authorized representative's filing which acknowledged credit counseling; she either appears to have *actually* had credit counseling or cannot deny that she had that counseling.  At this point, given the case's context, Ms. Kang is estopped from denying § 109(h) (and § 521) compliance.  "When a party assumes a certain position in a legal proceeding and convinces the court to accept that position, that party may not thereafter assume a contrary position."  *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001).  Without such estoppel, the bankruptcy system would be left open to abuse of process.  And, this court has statutory authority to prevent such abuse.  *See* 11 U.S.C. § 105(a). *See generally In re Parker,* 351 B.R. 790, 798-99 (Bankr. N.D. Ga. 2006) ("Debtor obtained the benefits [of] the automatic stay . . . [and] caused the Chapter 7 trustee to take action to engage professionals, expend administrative time to investigate . . . and take actions to liquidate property of the estate for the benefit of unsecured creditors . . . based upon the Debtor's implicit representation that he was eligible for bankruptcy relief"); *see also* cases cited in *In re Fiorillo,* 455 B.R. at 308 n.15.

14

**CONCLUSION**.

This court finds that Ms. Kang cannot hold herself out as a good faith proponent of her

motion to dismiss.  *Cf. Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007);

*Segarra-Miranda v. Acosta-Rivera,* 557 F.3d 8 (1st  Cir. 2009).  Nor can she establish an

appropriate cause for dismissal or overcome the prejudice that creditors would suffer from such a

dismissal.  Nor can she be allowed to deny her eligibility for bankruptcy.  The debtor's motion to

dismiss must, accordingly, be denied for all of the reasons set forth herein.


Dated: February 27, 2012                    /Morris Stern_____
                                            MORRIS STERN
                                            United States Bankruptcy Judge